|,MAX N. TOBIAS, Jr., Judge.
This is an appeal from a trial court judgment denying a motion to remove Daniel P. Mclntire, Sr.[1] (“Dr. Mclntire”) as testamentary executor of the estate of Sue Inez Laque Mclntire (“Mrs. Mcln-tire”). We affirm.
*1033 Mrs. Mclntire died testate on 24 February 1996. She was survived by her husband, Dr. Mclntire[2], and two sons from a prior marriage, Norbert J. and Daniel G. Gurtner (“the Gurtners”), appellants herein. Mrs. Mclntire’s last will and testament dated 16 September 1982, provided that, in the event she predeceased her husband, her separate property would go to her two sons, in equal shares. The testament further provided, in pertinent part:
1.2As particular legacies, I bequeath to my spouse, Dan, in full ownership, all of the right, title, and interest of which I die possessed in and to the following property:
a. our residences at the time of my death, the land upon which they are situated, all land contiguous thereto, which residences are currently located at Route 2, Box 532E, East 74th Street, Cut Off, Louisiana and 628 St. Philip Street, New Orleans, Louisiana;
b. all household furnishings and effects therein, and all automobiles; and
|ae. that portion of my residuary estate which, when added to the aforementioned bequests to my spouse and to all property received by my said spouse outside of this will that qualifies for the marital deduction for federal estate tax purposes, shall be equal in amount to that portion of the marital deduction allowable for federal estate tax purposes that shall be necessary to reduce the federal estate tax on my estate to zero after taking into account all credits and deductions available to my estate for federal estate tax purposes.
* * ❖ & *
1.3 I leave to my spouse the usufruct for his lifetime on the remainder of all the property of which I die possessed. I dispense with any requirement that he make a separate inventory or post bond or other security in regard to the usu-fruct. I expressly grant to and provide that my spouse, as usufructuary, shall have the right to dispose of consumable and non-consumable things subject to the usufruct, that the usufruct shall not terminate upon such disposition, and that the usufruct shall attach to the proceeds of such disposition and to the reinvestment thereof.
1.4 Subject to the lifetime usufruct granted to my spouse above, I leave the remainder of my estate to my children, in equal shares.
Mrs. Mclntire appointed Dr. Mclntire as the executor of her succession and, in the event he was unwilling or unable to serve, named her brother, Albert D. Laque, as an alternate executor.
The parties do not dispute the validity of the testament. Because Mrs. Mclntire executed the testament before January 1, 1996[3] and died after December 31, 1995, the issue of whether the Gurtners are forced heirs and the interpretation of the testament in light of the Supreme Court’s decision in In re Succession of Boyter, 99-0761 (La.1/7/00), 756 So.2d 1122, are disputed. Nonetheless, whether |3the trial court abused its discretion in not removing Dr. Mclntire as the executor is the only issue before us in this appeal.
On 24 November 1997, Dr. Mclntire petitioned the Civil District Court to appoint a notary to list the contents of a bank box *1034 in Mrs. Mclntire’s name located at the Chartres Street Branch of the Whitney-National Bank. Michael H. Mclntire, acting as the attorney for the succession, prepared, signed and submitted the petition. At that time, Dr. Mclntire believed the bank box contained U.S. savings bonds and/or insurance policies; further, he needed to ascertain the contents of the box for inventory purposes. The trial court appointed attorney and notary, Rene de-Laup, to open and list the contents of the bank box. On 23 December 1997, the Gurtners filed a petition for notice of the appointment of any administrator pursuant to La. C.C.P. art. 3091. Nothing in the record indicates the Gurtners were given notice of the appointment of Mr. deLaup for none was requested or required.
The following month Mr. deLaup withdrew as notary and Dr. Mclntire petitioned the court for appointment of a new notary to replace him. On the 3 February 1998, the district coui-t appointed attorney and notary, Archie Tatford, Jr., authorizing him to enter the bank box, list its contents, and deliver any bonds and/or insurance policies found therein to the respective named beneficiaries. On the same day, Dr. Mclntire filed a petition to probate Mrs. Mclntire’s will.
Unable to obtain any information regarding his mother’s succession, in August 1998 Norbert Gurtner retained the law firm of Jones, Walker, Waechter, Poitev-ent, Carrére & Denegre, L.L.P. as counsel. The Gurtners’ attorney sent a letter to Michael Mclntire requesting the status of the succession proceedings but he never responded.
|4On 18 September 1998, Dr. Mclntire filed a verified petition for possession in the succession, a sworn descriptive list of the estate’s assets and liabilities, and a receipt from the Louisiana Department of Revenue as proof that no state inheritance taxes were due. The trial court signed a judgment of possession the same day, placing the Gurtners in possession of the decedent’s separate property, which consisted of $24,000.00 in savings bonds and jewelry valued at $17,000.00. The judgment further recognized Dr. Mclntire as full owner and placed him in possession of the decedent’s undivided one-half Qk) of the community property, consisting of approximately $461,934.02 in immovable property, cash, stocks, bonds, annuities, and household furnishings. The Gurtners did not join in the petition for possession and received no notice that a judgment of possession had been sought. (They did not file a request for notice of judgment, of trial, or of notice of filing of a tableau of distribution as required by La. C.C.P. arts.1913, 1572 and 3305, respectively.)
After learning that the trial court had rendered a judgment of possession in the succession, Norbert Gurtner filed a motion for new trial, to vacate the judgment of possession, and to reopen the succession, alleging that the judgment was unlawfully obtained because he and his brother had not joined in the ex parte petition and had not unconditionally accepted the succession as required by La.C.C.P. art. 3031. In connection with the motion for new trial, Mr. Gurtner’s counsel twice attempted to depose Dr.- Mclntire but was unsuccessful. He then filed a motion to compel the deposition and for sanctions.
On 15 December 1998, Dr. Mclntire moved to vacate the previously rendered judgment of possession and to dismiss the motion to compel. The trial court vacated the previously rendered judgment of possession and re-opened the | ¡^succession on 17 December 1998. By judgment of 6 January 1999, the court ordered Dr. Mcln-tire to submit to a deposition and sanctioned Michael Mclntire $300.00 for his *1035 failure to cooperate with the setting of the deposition.
On 28 January 1999, Dr. Mclntire petitioned the court to confirm him as testamentary executor of the decedent’s succession and also filed an amended descriptive list of the succession property. The Gurt-ners’ counsel deposed Dr. Mclntire on 2 February 1999 and again on 24 March 1999. Dissatisfied with Dr. Mclntire’s answers to questions regarding decedent’s estate and alarmed at the substantial reduction in the listed value of the community property from the original to the amended descriptive list[4], the Gurtners moved to remove Dr. Mclntire as the executor alleging numerous acts of mismanagement and breach of his fiduciary duty.
At the hearing on the motion to remove, both Daniel and Norbert Gurtner testified and, in lieu of Dr. Mclntire’s live testimony, the parties agreed to the introduction of the transcripts of and evidence from his earlier depositions. In addition to the decedent’s will, the Gurtners submitted into evidence funeral and burial expense invoices, a partial inventory of the household furnishings and effects allegedly located in the community home at 628-628 $ St. Philip Street in New Orleans at the time of the decedent’s death, and photocopies of photographs taken inside the community home. The proffered evidence included a jewelry appraisal, a list of checking, savings, and retirement accounts allegedly prepared by the decedent, and affidavits of Dr. Mclntire and Barney Mclntire. After hearing the testimony and reviewing the evidence, the trial judge refused to remove Dr. [fiMcIntire, finding “that the allegations made against decedent’s surviving spouse [were] not sufficient to rise to the level of misconduct warranting removal.”
La. C.C.P. art. 3182, relative to the removal of a succession representative, provides, in part:
The court may remove any succession representative who is or has become disqualified, has become incapable of discharging the duties of his office, has mismanaged the estate, has failed to perform any duty imposed by law or by order of court, has ceased to be a domiciliary of the state without appointing an agent as provided in Article 3097(4), or has failed to give notice of his application for appointment when required under Article 3093. (Emphasis supplied.)
As to the general duties of a succession representative, La. C.C.P. art. 3191 provides, in part:
A succession representative is a fiduciary with respect to the succession, and shall have the duty of collecting, preserving, and managing the property of the succession in accordance with law. He shall act all times as a prudent administrator, and shall be personally responsible for all damages resulting from his failure so to act. (Emphasis supplied.)
A succession representative shall be deemed to have possession of all property of the succession and shall enforce all obligations in its favor. La. C.P.P. art. 3211. He shall preserve, repair, maintain, and protect the property of the succession. La. C.C.P. art. 3221.
Among the specific duties of the succession representative, La. C .C.P. art. 3222 provides that:
A succession representative shall deposit all moneys collected by him as soon as received, in a bank account in his official capacity, in a state or national bank in this state, and shall not with *1036 draw the deposits or any part thereof, except in accordance with law.
|70n failure to comply with the provisions of this article, the court may render a judgment against the succession representative and his surety in solido to the extent of twenty percent interest per annum on the amount not deposited or withdrawn without authority, such sum to be paid to the succession. He may also be adjudged liable for all special damage suffered, and may be dismissed from office.
Further, La. C.C.P. art. 3223 provides, in part:
When it appears to the best interest of the succession, and subject to the representative’s primary duty to preserve the estate for prompt distribution and to the terms of the testament, if any, the court may authorize a succession representative to invest the funds of the succession and make them more productive.
It is no defense to article 3222 that the succession representative honestly believes that he has a claim to the funds not deposited as required; he must first deposit succession funds in a succession account, and only then may he properly assert his claim thereto. Succession of Songne, 94-1198 (La.App. 3 Cir. 11/2/95), 664 So.2d 556.
Further, a succession representative may only pay succession debts with authorization of the court. La. C.C.P. art. 3301. Payment should commence after the expiration of three months from the date of death; but if a debt is urgent, the succession may ex paHe petition the court for authority to pay any debt. La. C.C.P. art. 3302. Ordinarily, debts of the succession may only be paid upon petition and an annex tableau of distribution. La. C.C.P. art. 3303. The application for authority to pay the debts must be advertised in accordance with La. C.C.P. art. 3304. A person may object to the proposed tableau of distribution and the matter is tried summarily. La. C.C.P. art. 3307. If a surviving spouse, heir or legatee requires funds for his or her maintenance during the administration, the person seeking the funds must proceed by contradictory motion against the succession | Srepresentative to obtain the payment of the funds. La. C.C.P. art. 3321. It is axiomatic that if the surviving spouse, heir or legatee is also the succession representative and objection from another is anticipated or known, the succession representative is required to request the court to appoint a temporary substitute succession representative against whom he or she may proceed contradictorily, thereby absolving the succession representative of the conflict. The succession representative may not use self-help to pay himself or herself that which he or she thinks he or she is entitled to without court authority obtained after a contradictory hearing.
Additionally, a succession representative is required to file annually an accounting of succession assets and disbursements. La.C.C.P. arts. 3331, 3333. The accounting must be served upon each heir or residuary legatee and an opposition must be filed within 10 days from the date of service or before homologation. La. C.C.P. art. 3335. If no opposition is filed and a judgment homologating the accounting, other than a final accounting, is obtained, the judgment is prima facie proof of its correctness. La. C.C.P. art. 3336.
In the instant case, the Gurtners allege several instances where Dr. Meln-tire has mismanaged the succession and failed to preserve the succession property. They claim that on the amended descriptive list submitted to the court, under the heading “Community Property,” Dr. Mclntire listed two bank accounts: First *1037 National Bank Smart Money Checking Account No. 0038-47543 in the name of Daniel P. Mclntire with a balance at the date of Mrs. Mclntire’s death of $124,705.83 and Whitney National Bank Savings Account No. 1071061791 in the name of Sue L. Mclntire with a balance at the date of her death of $2,688.62. Dr. Mclntire, however, failed to deposit the monies from the two accounts into a | ^separate succession account as required by La.C.C.P. art. 3222. They also claim Dr. Mclntire depleted the funds in the First National Bank account and closed the Whitney National Bank savings account without court approval.
At his 2 February 1999 deposition, Dr. Mclntire testified that during their marriage he and Mrs. Mclntire maintained separate cheeking accounts and that the funds in their respective accounts came from his income as a radiologist. According to him, the First National Bank account was his personal account and he continued to write checks drawn on the account since his wife died. Dr. Mclntire acknowledged that in the month following Mrs. Mclntire’s death he withdrew $28,600.00 from the First National Bank account and deposited the funds into two different Prudential Securities Retirement accounts for investment purposes. He also admitted that he gave a friend a $10,000.00 check drawn on his First National Bank checking account to purchase two airline tickets for a trip to China. He explained that he had invited the friend to accompany him and considered the trip as a gift. None of the transactions was done in accordance with La. C.C.P. arts. 3222, 3223, 3301, 3302, 3303, and/or 3321.
Regarding the Whitney Bank Savings account in the decedent’s name, Dr. Mcln-tire testified that he believed Michael Mclntire, the succession attorney, had closed the account when' the trial court rendered the original judgment of possession. According to him, Michael Mclntire had him obtain a cashier’s check in the amount of $2,688.62, the balance of the Whitney account on the date of Mrs. Mclntire’s death, which was to be distributed as succession assets at the close of the succession. Because the judgment of possession was vacated and the succession re-opened, the check was never negotiated.
|inThe Gurtners allege that Dr. Mclntire mismanaged the estate by knowingly misrepresenting the decedent’s separate assets as community assets on the amended descriptive list. Specifically, the record discloses that 32 U.S. savings bonds with a total face value of $24,000.00 were designated as the decedent’s separate property on the original sworn descriptive list and the ex parte judgment of possession had awarded these bonds to the Gurtners. The amended descriptive list, however, designated the bonds as community property. At his 24 March 1999 deposition, when questioned about the purchase and designation of the savings bonds, Dr. Mclntire readily admitted that Mrs. Mcln-tire had purchased them for her sons with monies she had inherited from her mother. He testified that he had no intention to redeem the bonds because he knew they were to go to his stepsons. He testified that Michael Mclntire had prepared the amended descriptive list but could not explain why the bonds were re-designated as community property.
The Gurtners also claim that Dr. Mcln-tire mismanaged their mother’s estate for his own benefit by overstating her funeral expenses on the amended descriptive list. As a succession liability, the amended descriptive list designated funeral expenses in the amount of $15,000.00 and perpetual care of the grave in the amount of $10,000.00. At the hearing on the motion to remove, the .Gurtners introduced into evidence an invoice from Falgout Funeral *1038 Homes, Inc., indicating the cost of funeral services was $5,501.54, and the perpetual care agreement between St. Charles Bor-romeo .Cemetery and Jeff Laque, Mrs. Mcintire’s brother, evidencing the costs to maintain the Laque Family tomb where the decedent was interred was $3,100.00. Dr. Mclntire testified at his deposition that he paid all funeral and burial expenses in connection with his wife’s death in addition to the perpetual care expenses for the Laque Family tomb. Although he could not recall Inthe total expenses, Dr. Mclntire testified that on the day of the funeral he wrote several checks for various expenses, including flowers and police escorts. He further testified that Michael Mclntire had prepared the amended descriptive list that listed the funeral and perpetual care expenses at $15,000.00 and $10,000.00, respectively.
Besides overstating the succession’s liabilities on the amended descriptive list, the Gurtners allege Dr. Mclntire understated the value of several of the succession’s assets. Though Dr. and Mrs. Mclntire had purchased their St. Philip Street home in the French Quarter in June of 1982 for $215,000.00, it was valued at only $220,000.00 on the amended descriptive list. Similarly, the total value of the home’s furnishings was valued at $1,500.00. The Gurtners assert that these estimated values are clearly too low.
Dr. Mclntire testified that he was familiar with French Quarter property and he, rather than a licensed real estate appraiser, estimated the value of the St. Philip Street property to be $220,000 .00. He also testified that since his wife’s death he resides primarily at his late mother’s home in Lafayette but still maintains the house in the French Quarter. Contrary to the Gurtners’ allegations, Dr. Mclntire insisted that he had not removed any of the household furnishings and appliances except for an old refrigerator that he had replaced. He also testified that a French Quarter antique dealer, whom he had consulted, appraised the value of the furniture at $1500.00. But he introduced no evidence to corroborate his assertion.
Further attempting to conceal the true value of the decedent’s estate, the Gurt-ners contend Dr. Mclntire intentionally omitted a 1993 Lincoln Town Car, real | ^estate in Arkansas and St. Tammany Parish, a sable fur coat, and Newmont Mining Corporation stock as succession assets on the descriptive list.[5]
At both depositions, Dr. Mclntire testified that the 1993 Lincoln Town car was not included as a succession asset because it was a birthday gift to him from his son, Barney, and, therefore, his separate property. Likewise, the Arkansas[6] and St. Tammany Parish real estate were part of *1039 his separate property because he had purchased the properties prior to his marriage to the decedent.
Dr. Melntire testified that he had given Mrs. Melntire a sable fur coat as a birthday gift. Although he could not explain why it was omitted from the descriptive list, at his first deposition in February 1999, he recalled retrieving the coat from Koslow’s after his wife’s death, paying the storage fee, and storing it some place in Delacambre, a small town a few miles from Lafayette. At his second deposition on 24 March 1999, Dr. Melntire changed his earlier testimony, testifying that he had given the coat to his friend, Lee Dooley, who had placed it in storage at Parisian’s, an upscale department store in Lafayette. He also testified that he had the coat cleaned and appraised by a furrier, who appraised its value at $1000.00. Dr. Melntire offered to turn the coat over to the Gurtners’ counsel at the conclusion of the deposition.
l1sAs to the Newmont Mining Corporation stock, Dr. Melntire testified that he had purchased $30,000.00 of the stock after Mrs. Mclntire’s death with funds from an account he had established with Mutual of New York in the early 1970’s. He explained that he had closed the Mutual of New York account, which had a balance of $130,000.00, and reinvested the funds by purchasing stock and transferring the remaining $100,000.00 to a Prudential Securities retirement account.
It is well settled that even when actual mismanagement is shown the trial court is not required to remove the executor, but retains the discretion to make whatever decision it feels is appropriate under the facts of the particular case. Succession of Houssiere, 247 La. 764, 174 So.2d 521 (1965); Succession of Krushevski, 528 So.2d 743 (La.App. 4 Cir.1988).
On appeal, the Gurtners argue that the trial court abused its discretion in not removing Dr. Melntire as the executor where the evidence clearly disclosed that he had mismanaged the succession, failed to preserve its assets, and breached his fiduciary duty as a succession representative. They also argue that Dr. Melntire is neither credible nor capable of discharging the duties of an executor.
It is apparent from the videotaped 24 March 1999 deposition that Dr. Melntire, though physically frail, is mentally alert and capable of handling his affairs. Nothing in record suggests that he is unable to carry out the duties as the executor of the succession. Dr. Melntire, however, has not complied with the general and specific duties required of a succession representative pursuant to the Louisiana Code of Civil procedure. He failed to open a separate bank account for the succession and deposit the succession funds therein as required by La. C.C.P. art. 3222. In violation of the same article, Dr. Melntire withdrew funds from |14checking and savings accounts that he acknowledged were property of the community that existed between him and the decedent. He invested some of the funds from a community checking account without court authorization pursuant to La. C.C.P. art. 3223. Dr. Melntire failed to obtain a professional appraisal of the St. Philip Street property and to account for all of the succession’s assets. He further paid succession debts without proper authorization and failed to file the mandated annual accountings. All of these are grounds for removal.
One could argue that the Gurtners have not demonstrated that they have been damaged or prejudiced by Dr. Mclntire’s actions. The evidence discloses that Dr. Melntire mistakenly presumed he could conduct his affairs as he had prior to Mrs. *1040 Mclntire’s death.[7] The Gurtners claim that Dr. Mclntire “plundered” succession assets. However, after viewing the video deposition, one cannot say with absolute certainty that the withdrawals, transfers, and reinvesting of succession funds by Dr. Mclntire were not done in good faith, albeit unwisely and without adequate legal advice or full knowledge of his duties and powers. Also, one can view the evidence as failing to disclose that Dr. Mclntire knowingly concealed succession assets or large sums of community funds. Having carefully reviewed the record, we cannot say that the trial court abused its vast discretion by refusing to remove Dr. Mcln-tire as succession executor at this time. However, nothing precludes the Gurtners from reurging that Dr. Mclntire should be removed if he does not promptly, accurately and carefully comply with the procedural law applicable to succession representatives.
_Ji5Finally, the Gurtners argue that Dr. Mclntire should be removed as executor because the succession might have claims against him, citing the case of Succession of Robinson, 393 So.2d 268 (La. App. 1 Cir.1980). There, the succession representative was the divorced spouse of the decedent. Before her death, the decedent had obtained a judgment against her former husband awarding her $13,500.00 in past due alimony. The appeal of the judgment was pending when the former husband was appointed succession representative. Upon discovering the conflict, the trial court removed the former husband. The appellate court affirmed, finding the succession had an “actual” rather than potential claim against the former husband and because the succession administrator was the proper party plaintiff to pursue the claim, a clear conflict of interest existed. Unlike the succession representative in Robinson, Dr. Mclntire is not a judgment debtor of the decedent and no actual conflict of interest exists. We find no merit to this argument.
Accordingly, for the reasons stated herein, we affirm the judgment of the trial court.
AFFIRMED
LOVE, J., concurs with reasons.

. Daniel P. Mclntire, Sr., earned both a M.D. and J.D.

. Dr. Mclntire had five sons from a prior marriage, George, Daniel P., Jr., Barney, Michael, and Shaun Mclntire.

. January 1, 1996 was the effective date of La. Act No. 1180 of 1995, which implemented the 1995 amendment to La. Const. Art. XII, § 5 and abolished forced heirship.

. The original descriptive list filed in the record stated the total value of the community property as $923,868.05 whereas the amended descriptive list valued it at $393,228.23.

. The Gurtners do not complain that the decedent’s white Ford Thunderbird was omitted from the amended descriptive list or that her fine jewelry and silver flatware were listed as "missing.” The evidence in the record discloses that Lynn Gurtner, Dan’s wife, had been in possession of the Thunderbird since shortly before Mrs. Mcintire’s death. Dan Gurtner testified that the year before his mother died she gave him the silver flatware and asked him to distribute it among his cousins. Dr. Mclntire acknowledged that his wife had inherited a set of silver flatware when her mother died which was her separate property. However, he claimed that during their marriage they had purchased additional silver flatware that was taken from the community home and has not been located. The evidence further indicates that shortly before his mother's death, Dan Gurtner brought the decedent to a local jeweler where she had several pieces of her fine jewelry appraised and placed for sale as estate jewelry. According to Dan Gurtner, after several pieces of the jewelry sold, he divided the ■ proceeds with his brother.

. The ownership of Arkansas real estate is governed by Arkansas law.

. Consideration should be given to the fact that Dr. Mclntire was also a licensed Louisiana attorney-at-law and did, at some point, practice law.